IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION

| | |
|---|---|
| **TONY C. GIBSON,**<br>   Plaintiff,<br><br>v.<br><br><br>**MICHAEL J. ASTRUE,**<br> Commissioner of Social Security,<br>   Defendant. | Civil Action No. 2:07cv00033<br>**REPORT AND<br>RECOMMENDATION**<br><br>By: PAMELA MEADE SARGENT<br>UNITED STATES MAGISTRATE JUDGE |

*I. Background and Standard of Review*

Plaintiff, Tony C. Gibson, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2003 & Supp. 2008). This court has jurisdiction pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more

-1-

than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Gibson protectively filed his application for SSI on June 13, 2005, alleging disability beginning January 1, 1993, due to depression. (Record, ("R."), at 14, 57-62, 95 ) The claim was denied initially and on reconsideration. (R. at 44-46, 50, 52-54.) Gibson then requested a hearing before an Administrative Law Judge, ("ALJ"). (R. at 43.) The ALJ held a hearing on December 21, 2006, at which Gibson was represented by counsel. (R. at 568-95.)

By decision dated February 2, 2007, the ALJ denied Gibson's claim. (R. at 14-24.) The ALJ found that Gibson had not engaged in any substantial gainful activity since his alleged onset date. (R. at 16.) The ALJ found that the medical evidence established that Gibson had a severe combination of impairments, namely musculoskeletal problems, depression, anxiety, borderline personality disorder and borderline intellectual functioning, but he found that Gibson's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16-17.) The ALJ also found that Gibson had the residual functional capacity to perform a limited range of light work.[1] (R. at 17-22.) In particular, the ALJ found that Gibson could perform only simple, low-level tasks

---

[1]Light work involves lifting objects weighing up to 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. If an individual can do light work, he also can do sedentary work. *See* 20 C.F.R. § 416.927 (b) (2008).

involving infrequent changes in work duties. (R. at 17.) He also found that Gibson was precluded from working with the general public. (R. at 17.) Based on Gibson's age, education, past work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed that Gibson could perform, including jobs as a cleaner, a food service worker, a hand packer, a sorter and an assembler. (R. at 22-23.) Therefore, the ALJ found that Gibson was not under a disability as defined in the Act at any time through the date of his decision, and that he was not eligible for benefits. (R. at 23-24.) *See* 20 C.F.R. § 416.920(g) (2008).

After the ALJ issued his decision, Gibson pursued his administrative appeals, (R. at 9), but the Appeals Council denied his request for review. (R. at 3-5.) Gibson then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2008). The case is before this court on the Gibson's Motion for Summary Judgment filed on November 21, 2007, and the Commissioner's Motion for Summary Judgment filed December 19, 2007.

## *II. Facts*

Gibson was born in 1971, (R. at 57, 571), which classifies him as a "younger person" under 20 C.F.R. § 416.963(c) (2008). Gibson completed through only the ninth grade in school in "learning disability" classes. (R. at 89, 101, 573-74, 584-85.) According to Gibson, he has worked a total of only four weeks in his lifetime. (R. at 96.) Gibson has a history of incarceration, as well as a history of involuntary commitments in mental health treatment facilities to prevent self-harm. (R. 87-89, 97-

98, 575-77.)

Donna Bardsley, a vocational expert, also was present and testified at Gibson's hearing. (R. at 591-93.) Bardsley was asked to consider a hypothetical individual of Gibson's age, education and work experience who had the residual functional capacity to perform light, simple, low-stress jobs "that would not require him to regularly interact with the general public." (R. at 592.) Bardsley stated that a significant number of jobs existed that such an individual could perform, including jobs as a cleaner, a food service worker, a hand packager, a sorter and an assembler. (R. at 592.) Bardsley also was asked to assume that the same individual was moderately impaired in his ability to concentrate and persist at work tasks and in dealing with work stresses. (R. at 592-93.) Bardsley stated that there would be no jobs such an individual could perform. (R. at 593.)

In rendering his decision, the ALJ reviewed records from Marion Correctional Treatment Center; Frontier Health; Dr. Nat Ewing, M.D.; Dr. Neal Sanders, M.D.; Lee Regional Medical Center; Stone Mountain Health Services; Lonesome Pine Hospital; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Dr. Kevin Blackwell, D.O.; Howard Leizer, Ph.D., a state agency psychologist; and E. Hugh Tenison, Ph.D., a state agency psychologist.

On July 29, 1998, Gibson was admitted at Marion Correctional Treatment Center, ("MCTC"), after his third attempt at self-injurious behavior within the previous year while being incarcerated. (R. at 152-55.) Gibson was experiencing auditory hallucinations and had recently cut his wrist. (R. at 152.) Gibson claimed that he had attempted suicide on five previous occasions. (R. at 152.) Gibson reported

no physical problems upon his admission. (R. at 153.) Gibson was diagnosed with a dysthymic disorder, alcohol dependence and cannabis dependence. (R. at 154.) Gibson's Global Assessment of Functioning score, ("GAF"), was assessed at 60.[2] (R. at 155.)

On October 26, 1999, Gibson was admitted at MCTC after cutting his wrist on October 17, 1999, while incarcerated. (R. at 149-51.) Gibson was diagnosed with a dysthymic disorder, polysubstance dependence and alcohol dependence. (R. at 151.) Gibson's GAF score was assessed at 55. (R. at 151.) Gibson again was admitted to MCTC on June 10, 2002, and remained there until his discharge on June 10, 2005. (R. at 156-350.) Upon his admission, Gibson's physical examination was normal, except for multiple staples in his right arm due to self-inflicted wounds. (R. at 316-18.)

According to Gibson's MCTC Medical Discharge Summary, a physical examination performed on June 6, 2005, was within normal limits. (R. at 156, 164.) The summary stated that Gibson had been treated for self-inflicted puncture wounds to his abdomen requiring surgery in October 2002, March 2003, May 2003 and February 2005. (R. at 156.) The summary also stated that no further medical treatment was necessary. (R. at 156.) A Discharge Summary stated that Gibson had been diagnosed with early onset dysthymic disorder, major depressive disorder, panic symptoms, personality disorder with borderline and antisocial features, alcohol

---

[2]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

-5-

dependence and polysubstance dependence while at MCTC. (R. at 160.) Gibson's GAF score upon his discharge was assessed at 35.[3] (R. at 163.) Dr. John B. Bench, M.D., a psychiatrist, stated that Gibson's prognosis was "moderate at best." (R. at 162.) Dr. Bench also stated, "[i]f he can become involved in some type of gainful employment such as small engine repair and remain sober as well as compliant with his medications he may have a reasonably good chance [of] not re-offending and staying out of institutions." (R. at 162.)

Upon his release from prison, Gibson started treating with Lee County Behavioral Health Services. (R. at 351-402.) On June 13, 2005, Gibson reported that he had a long history of depression and anxiety. (R. at 377.) Gibson reported a history of multiple suicide attempts and self-mutilations. (R. at 378.) He reported that his symptoms were under control with his psychiatric medication, Prozac. (R. at 378.) Gibson denied suffering from any physical problems. (R. at 389.) He specifically denied suffering from any pain. (R. at 389.)

On June 17, 2005, Dr. Syed Z. Ahsan, M. D., conducted an initial psychiatric evaluation. (R. at 360-63.) Gibson reported that he was doing fairly well. (R. at 361.) Gibson reported that he was living with his aunt and uncle and helping them on their farm. (R. at 361.) He also reported that he intended to look for work to support himself. (R. at 361.) Despite his extensive history of alcohol and drug use, Gibson denied any craving or desire for these substances. (R. at 361.) Dr. Ahsan noted that Gibson appeared clinically stable. (R. at 362.) Dr. Ahsan diagnosed dysthymic

---

[3] A GAF score of 31 to 40 indicates "[s]ome impairment in reality testing or communication ... OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. ..." DSM-IV at 32.

-6-

disorder by history, rule out bipolar disorder, impulse control disorder, not otherwise specified, personality disorder, not otherwise specified, and borderline, antisocial personality traits by history. (R. at 362-63.) Dr. Ahsan assessed Gibson's GAF score at 70-75.[4] (R. at 363.) Dr. Ahsan continued Gibson on Prozac. (R. at 363.)

Gibson saw his case manager, Wendy Woliver Burgin, B.S.N., on June 24 and July 6, 2005. (R. at 367-68.) On both dates Burgin noted that Gibson did not report any psychiatric problems. (R. at 367-68.) On September 19, 2005, Burgin again noted that Gibson was doing well. (R. at 354-55.) The last note, dated October 3, 2005, states that Gibson left that day without being seen. (R. at 354.) On October 31, 2005, Gibson reported increased depression, irritability and anger spells. (R. at 504.) Gibson was started on Zyprexa at night in addition to Prozac. (R. at 502-04.) Gibson did not keep his November 30, 2005, appointment. (R. at 501.)

On December 1, 2005, Gibson reported that he took only one dose of Zyprexa before he discontinued it. (R. at 500.) Gibson stated that he thought it made him feel more irritable and angry. (R. at 500.) Burgin reported that Gibson appeared mentally stable. (R. at 500.) On January 23, 2006, Gibson reported feeling more depressed over the previous few days. (R. at 497.) Gibson's girlfriend accompanied him to his appointment and told Burgin that he had recently threatened suicide. (R. at 497.) Gibson's Prozac was discontinued, and he was started on Lexapro. (R. at 497.) On

---

[4]A GAF score of 61-70 indicates "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... , but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32. A GAF score of 71-80 indicates that, "[i]f some symptoms are present, they are transient and expectable reactions to psychosocial stressors...; no more than slight impairment in social, occupational, or school functioning." DSM-IV at 32.

February 21, 2006, Gibson reported doing better on Lexapro. (R. at 494.)

On March 21, 2006, Gibson met with Shannon Renee Moles, B.A., and reported problems sleeping. (R. at 493.) On May 3, 2006, Gibson reported that he was doing well. (R. at 489.) He reported that his mood was stable. (R. at 489.) Gibson said that he was keeping himself busy with yardwork and working around the home. (R. at 489.) On June 7, 2006, Moles assessed Gibson's GAF score at 50.[5] (R. at 479-81.) On August 24, 2006, Gibson reported doing well mentally with no problems or concerns. (R. at 474.) On September 25, 2006, Gibson reported feeling more anxious and being unable to sit still for any period of time. (R. at 473.) He also reported that his sleep had deteriorated. (R. at 473.) Gibson was given samples of Zyprexa to take at bedtime. (R. at 473.) On October 12, 2006, Gibson reported that he did not tolerate the Zyprexa and discontinued its use. (R. at 468.) On December 13, 2006, Gibson reported some paranoid feelings. (R. at 542.) He also reported having some tearful spells, which he attributed to the recent death of this brother. (R. at 542.)

On August 11, 2006, Gibson was admitted to Lee Regional Medical Center complaining of right-sided abdominal pain. (R. at 429.) Gibson was diagnosed with acute appendicitis. (R. at 429.) Upon admission, Gibson denied any neurological or musculoskeletal problems and these examinations were normal. (R. at 439.) An appendectomy was performed, and Gibson was discharged on August 13, 2006. (R. at 429-32.)

On November 17, 2006, Gibson was admitted to Wellmont Lonesome Pine

---

[5]A GAF of 41-50 indicates that the individual has serious symptoms or serious impairments in social, occupational or school functioning. *See* DSM-IV at 32.

Hospital and had his gallbladder removed. (R. at 508-12.) Gibson returned to Lonesome Pine Hospital on November 23, 2006, complaining of bleeding from his surgical site. (R. at 531-41.)

On August 10, 2005, Howard Leizer, Ph.D., a state agency psychologist, completed a mental assessment indicating that Gibson had moderate limitations in his ability to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to work in coordination with or proximity to others without being distracted by them, to make simple work-related decision, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and to respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. (R. at 417-19.) This assessment was affirmed by E. Hugh Tenison, Ph.D., another state agency psychologist, on October 28, 2005. (R. at 419.)

Leizer also completed a Psychiatric Review Technique form, ("PRTF"), indicating that Gibson suffered from an affective disorder and substance addiction disorders. (R. at 403-16.) Leizer indicated that Gibson had moderate limitations in activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace and that he had not experienced any episodes of

decompensation. (R. at 413.) Leizer noted that Gibson was capable of performing simple, nonstressful work. (R. at 416.) This PRTF was affirmed by state agency psychologist Tenison on October 28, 2005. (R. at 403.)

On October 10, 2006, Gibson saw Dr. Ann Marie Mackway-Girardi, D.O., with Stone Mountain Health Services. (R. at 460-62.) Gibson complained of diarrhea, pain and swelling in his right knee and pain in his lower back for years. (R. at 460-62.) Dr. Mackway-Girardi noted no swelling in Gibson's extremities. (R. at 461.) She specifically noted that there was not any swelling in Gibson's right knee. (R. at 460.) December 26, 2006, x-rays of Gibson's right knee showed no significant abnormality. (R. at 553.) X-rays of Gibson's lumbar spine taken the same day showed a suggestion of spondylolysis at the lumbosacral junction without evidence of any spondylolisthelis. (R. at 553.) No fracture or any other significant abnormalities were noted. (R. at 553.) Dr. Mackway-Girardi told Gibson to avoid forcing his knee if it locked and to avoid heavy lifting. (R. at 460.) She also instructed Gibson in some exercises to address his complaints of back pain. (R. at 460.)

B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, conducted a psychological evaluation of Gibson on December 27, 2006. (R. at 554-58.) Lanthorn found Gibson to be fully oriented. (R. at 554.) Gibson showed no signs of ongoing psychotic processes or delusional thinking. (R. at 556.) Gibson reported that he hurt his back when he was younger and that he continued to have lumbar pain as well as pain in his knee. (R. at 556.) Gibson reported no problems with memory deficits or concentration. (R. at 556.) Gibson also said he avoided crowds. (R. at 556.)

Lanthorn diagnosed the need to rule out an impulse control disorder and a

-10-

dysthymic disorder. (R. at 557.) Lanthorn also diagnosed borderline intellectual functioning and a personality disorder, not otherwise specified, with antisocial and borderline features. (R. at 557.) Lanthorn assessed Gibson's GAF score at 65. (R. at 557.) Lanthorn stated that Gibson displayed no signs of bipolar disorder and few, if any, signs of severe depression. (R. at 557.) Lanthorn stated that Gibson was "capable of sustaining regular 40 hour a week work particularly at simple and repetitive tasks." (R. at 558.)

On January 5, 2007, Dr. Kevin Blackwell, D.O., examined Gibson at the request of the state agency. (R. at 559-63.) On that date, Gibson stated that his back pain was a four to five on a 10-point scale. (R. at 559.) Gibson later stated that "on a bad day" his pain level was an eight out of 10. (R. at 559.) Dr. Blackwell noted that Gibson did not appear to be in any acute distress. (R. at 560.) He noted that Gibson was tender in the lumbar musculature, but he noted no evidence of muscle spasm. (R. at 561.) Dr. Blackwell noted no effusion or obvious deformities in Gibson's lower extremity joints, but he did note some crepitus with active range of motion in both knees. (R. at 561.) Dr. Blackwell noted no instability in ligament testing. (R. at 561.) Dr. Blackwell opined that Gibson should limit squatting and kneeling activities to one-third of the workday or less and bending or stooping activities to two-thirds of the workday or less. (R. at 561.) Dr. Blackwell also stated that Gibson should limit his lifting to items weighing no more than 50 pounds occasionally and 25 pounds frequently. (R. at 561.) He further found that Gibson was capable of standing for up to eight hours and sitting for up to eight hours in an eight-hour workday with normal positional changes. (R. at 561-62.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). The process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2008).

Under the analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated February 2, 2007, the ALJ denied Gibson's claim. (R. at 14-24.) The ALJ found that Gibson had not engaged in any substantial gainful activity since his alleged onset date. (R. at 16.) The ALJ found that the medical evidence established that Gibson had a severe combination of impairments, namely

musculoskeletal problems, depression, anxiety, borderline personality disorder and borderline intellectual functioning, but he found that Gibson's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16-17.) The ALJ also found that Gibson had the residual functional capacity to perform a limited range of light work. (R. at 17-22.) In particular, the ALJ found that Gibson could perform only simple, low-level tasks involving infrequent changes in work duties. (R. at 17.) He also found that Gibson was precluded from working with the general public. (R. at 17.) Based on Gibson's age, education, past work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed that Gibson could perform, including jobs as cleaner, a food service worker, a hand packer, a sorter and an assembler. (R. at 22-23.) Therefore, the ALJ found that Gibson was not under a disability as defined in the Act at any time through the date of his decision, and that he was not eligible for benefits. (R. at 23-24.) *See* 20 C.F.R. § 416.920(g).

Gibson argues that the ALJ erred by failing to perform the proper pain analysis and by relying on a vocational expert opinion which was given in response to an incomplete hypothetical. (Memorandum In Support of Plaintiff's Motion For Summary Judgment), ("Plaintiff's Brief"), at 9-12.) Based on my review of the ALJ's opinion, I find the first argument without merit. My review of the ALJ's opinion and the testimony of the vocational expert reveals, however, that the second argument is correct; the ALJ did not pose a proper hypothetical to the vocational expert.

The Fourth Circuit has adopted a two-step process for determining whether a claimant is disabled by pain. First, there must be some objective medical evidence of

the existence of a medical impairment which could reasonably be expected to produce the actual amount and degree of pain alleged by the claimant. *See Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain affects the claimant's ability to work. *See Craig*, 76 F.3d at 595. Once the first step is met, the ALJ cannot dismiss the claimant's subjective complaints simply because objective evidence of the pain itself is lacking. *See Craig*, 76 F.3d at 595. This does not mean, however, that the ALJ may not use objective medical evidence in evaluating the intensity and persistence of pain. In *Craig*, the court stated:

> Although a claimant's allegations about [his] pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges [he] suffers. ...

76 F.3d at 595.

Here, the ALJ, in his decision, specifically stated that he found "that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible." (R. at 17.) The first prong of the pain analysis having been met, the ALJ simply found that the objective medical evidence of record did not support Gibson's subjective allegations regarding his symptoms. It is well-settled that an ALJ's assessment of a claimant's credibility regarding the severity of pain is entitled to great

-14-

weight when it is supported by the record. *See Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984). Credibility determinations as to a claimant's testimony regarding his pain are for the ALJ to make. *See Shively*, 739 F.2d at 989-90.

In this case, I find that substantial evidence supports the ALJ's finding that Gibson's subjective pain complaints were not fully credible. The record demonstrates, and the ALJ recognized, that Gibson had experienced chronic back and knee problems. The same record, however, does not support the argument that Gibson was totally disabled as a result of back and knee pain. On October 10, 2006, Dr. Mackway-Girardi noted that Gibson's right knee was not swollen. (R. at 460.) The physician's treatment note of this date makes no mention of her prescribing any pain medication. Instead, the note mentions that Dr. Mackway-Girardi simply told Gibson to avoid forcing his knee if it locked and to avoid heavy lifting. (R. at 460.) The note further reflects that Dr. Mackway-Girardi instructed Gibson in some exercises to address his complaints of back pain. (R. at 460.)

On January 5, 2007, Dr. Blackwell noted no ligament instability in Gibson's knees. (R. at 561.) Dr. Blackwell placed no significant restrictions on Gibson's work-related activities other than restricting his lifting to weights of 50 pounds or less. (R. at 561.)

Furthermore, the record contains extensive mental health treatment notes documenting treatment from 1998, (R. at 150-63, 165-67, 170-315, 319-31), few, if any, of which make any mention of Gibson experiencing trouble coping with pain. In fact, many of these reports document that Gibson complained of no physical problems, other than those related to self-inflicted lacerations. (R. at 153, 164, 272,

316-18, 341-42, 389-90.)

Based on this, I find that substantial evidence supports the ALJ's finding as to the credibility of Gibson's pain complaints. The record does show, however, that Gibson has suffered from serious psychiatric problems since as early as his late teens. (R. at 159-60, 361.) The record further documents serious drug and alcohol abuse, (R. at 160, 342, 343, 361), and at least one lengthy period of incarceration. (R.at 341-44, 377-78.) These records also document numerous attempts by Gibson to harm himself, including multiple suicide attempts, resulting in numerous involuntary committals to psychiatric facilities. (R. at 159-60, 341-44, 362.)

Based on the psychological or psychiatric evidence of record, the ALJ found Gibson could perform only simple, low-level tasks involving infrequent changes in work duties. (R. at 17.) The ALJ also found that Gibson was precluded from working with the general public. (R. at 17.) Gibson does not challenge this finding. Rather, Gibson argues that the ALJ's finding that he was not disabled was based on vocational expert testimony which was given in response to a hypothetical question which did not accurately reflect this finding. A review of the hearing transcript supports this argument. Instead of asking the vocational expert to assume an individual who was "precluded from working with the general public," the ALJ asked the vocational expert to assume an individual who could perform jobs "that would not require him to regularly interact with the general public." (R. at 592.) *See Walker v. Bowen*, 889 F.2d 47, 51 (4th Cir. 1989).

Case 2:07-cv-00033-JPJ-PMS   Document 20   Filed 08/22/08   Page 16 of 18   Pageid#: 80

Based on this, I find that substantial evidence does not support the ALJ's finding the other jobs existed that Gibson could perform. Therefore, I recommend that the court deny Gibson's and the Commissioner's motions for summary judgment, vacate the Commissioner's decision denying benefits and remand Gibson's claim to the Commissioner for further development.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists to support the ALJ's finding as to Gibson's residual functional capacity, including his findings as to the credibility of Gibson's complaints of disabling pain;

2. Substantial evidence does not exist to support the ALJ's finding that other jobs existed which Gibson could perform; and

3. Substantial evidence does not exist to support the ALJ's finding that Gibson was not disabled under the Act.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Gibson's and the Commissioner's motions for summary judgment, vacate the Commissioner's decision denying benefits and remand Gibson's claim to the Commissioner for further development consistent with this Report And Recommendation.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(c) (West 2006):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED: This 22nd day of August 2008.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE